Thank you, Your Honor. Your Honor, my name is Brian Kimble, and I represent the plaintiff in this case, Steel Dynamics Columbus, LLC. From Steel Dynamics' perspective, the most important issue in the case is whether the district court erred by refusing to allow Steel Dynamics to recover the full purchase price, $447,000, of equipment known as Continuous Emissions Monitoring Systems. And I'll refer to those as SIMs throughout the argument. These were ordered from Altech. They were specially designed by Altech to meet the needs of Steel Dynamics to comply with Steel Dynamics' Title V permit, which required these units to monitor four different types of pollutants that are generated as part of the steel production manufacturing process at Steel's plant in northern Mississippi. Your Honor, after the court had heard the facts of the case, this was a bench trial, heard about the years of attempted repairs, the three years of attempted repairs of these SIMs units, and unsuccessful repairs, the court's ultimate factual finding with respect to these SIMs that we spent $447,000 on was this, and I quote, the court concludes that the SIMs as delivered were unsuitable and insufficient for their specified purpose, monitoring pollutants in compliance with Steel's Title V permit. So I believe a fair understanding of the court's ultimate factual finding with respect to this equipment that for the purposes these SIMs were purchased, for the purpose they were purchased, monitoring these four pollutants, they provided no value to Steel Dynamics. When Steel Dynamics, when we began trial and were doing research on this case and our requirements for damages, we relied primarily on a case from the Mississippi Supreme Court from 1986 called Fetters v. Boatwright. It bears a striking resemblance to the facts of this case. Fetters dealt with a multi-component piece of equipment, a heat pump that heat and cooled the plaintiff's homes there. And what the court said, there's years and years of attempted repairs on the heat pump. What the court said in that instance was that if the heat pump, and I'm quoting now, if the heat pump could not be repaired and was worthless, the Boatwrights under 752714 would have been entitled to a refund of the purchase price. But is worthless the same as unrepairable? I believe worthless, Your Honor, is the same as unrepairable in the context of worthless for the purpose for which it was purchased. Isn't it clear that the Fetters court distinguished between unrepairable and worthless? That quotation fooled me, too, the first time I read it. Your Honor. I had consideration. I don't think those two are the same thing. Your Honor, and I know the passage that you're discussing. Counsel is presenting in the brief. And if I may distinguish that passage just a bit. In that passage from Fetters where the court is pointing out that there were components of the heat pump that didn't need to be replaced and components that could be replaced. In that section of Fetters, if Your Honor, we'll review that section carefully. That section of Fetters, the court is discussing the repair and replace obligation if the seller had chosen to repair or replace the heat pump. In other words, what the court said, and it was absolutely reasonable, that the heat pump had a bunch of parts. If you were going to repair it as the seller, you didn't have to replace the whole thing. That is not what you're obligated to do. You only had to replace the parts that were defective. And our reading of Fetters, though, is once the seller breached that repair and replace warning and did not identify, as here, they couldn't identify what parts were defective, then the purchaser had the opportunity to recover the entire purchase price of the equipment. Now, isn't there evidence in this case that some of the material that was sold by Steele, your client, was used subsequently? That is absolutely correct, Your Honor. And if I may discuss that, and I'm happy to address that. But it wasn't worthless. It was worthless, Your Honor, for the purpose that it was purchased. But if, Your Honor, there were pieces of the unit that had some future utility— So that's what Fetters says, worthless for the purpose that it was purchased. You're saying that's what Fetters— I'm saying that, Your Honor, that is not the words they used, but I'm— That's your interpretation. That's my interpretation, Your Honor. And we will say, and I do want to address Your Honor's question as well, but we will say that every other authority that we've seen that cited that sentence from Fetters, which are two authorities, have interpreted it the same way that we have interpreted Fetters. And they're not, you know, binding authority, but they've interpreted that sentence, and it's interpreted it the same way that we've interpreted it. Now, in terms of, Your Honor, addressing, there was $23,000 of parts from the Sims that provided no use to us that we did use in subsequent—in subsequent Sims. That, though, Your Honor, the 752714, which is what Fetters was interpreting, is the initial calculation of the loss. But if you could use things, if there was other values, other things you could use with pieces and parts of machinery, Your Honor, we view that as more of a mitigation of damages sort of an issue. And mitigation of damages is going to be ruled by 7527152A, which you have an obligation to mitigate damages. But that is not our burden of proof, Your Honor. Burden of proof for mitigation of damages is the defendant. And if I may, if the Court will indulge me, I have an illustration that, for me, frames the issue in terms of mitigation versus what's happening with 752714, the initial damage calculation. If we had ordered from Alltech the Rolls-Royce of Sims units, it was easier to operate, easier to maintain. It was more elegantly designed. If we had ordered that, and most importantly, it monitored those four pollutants. That was why we were ordering it. If we had ordered the Rolls-Royce of Sims and paid for it, but Alltech instead delivered the Toyota of Sims, a fine car to get you down the road, maybe not have all the bells and whistles, but it still does what it's supposed to do, monitor those four pollutants. So there was value there for the purpose we purchased it. The difference between a Rolls-Royce, and this is how 752714 would work here. We would get the difference back between the Rolls-Royce price we paid and the Toyota we purchased because that Toyota could still do the job. What happened here is something different, and this is where the mitigation comes in. What happens here is we didn't get a Toyota. We got a car from the junkyard. The wheels didn't turn. The engine wouldn't come on. There was no utility to us at all for the purpose for which we purchased it. And in that instance, if someone had come along and said, hey, Steel Dynamics, I know this car won't go, it won't get you down the road, but those are good-looking tires on it. Will you sell them to me for $100? And if we had said, nah, Alltech's going to eat all of this, I'm not selling you the tires for $100 even though it was easy to do, then that would have been a failure to mitigate. And I also would say we cited probably six different cases from other jurisdictions. Applying 752714 in the same manner as we interpret fetters to advocate applying that. When a purchaser purchased something and it had no value for the purpose it was purchased but arguably had some value as scrap or some other purpose, these courts were consistently allowing the buyer to recover the entire purchase price. I would submit, Your Honor, and I didn't see it in their briefs. Mr. Kimball. Yes, ma'am. I would like you and opposing counsel to answer the question of whether either of you have found a case interpreting the fetters standards disjunctively, as this court judge here did, and thereby limiting recovery where there was a repair or replace warranty and the item purchased was not serviceable for the purpose for which it was purchased. Is there any other case besides this one that refuses to give the purchase price? Your Honor, from steel dynamics research and our point of view, we have not discovered such a case. And from my reading of counsel opposites, authorities cited, I did not see where they had found a case in any jurisdiction that interpreted this in the disjunctive. So from our perspective, Your Honor, the answer is no. It's always been that if it can't be repaired, it is therefore worthless. Also, I would like to just point out the sort of difficult position, if you interpret it the way we believe ALTEC wants this statute interpreted, the difficult position that the buyer who has suffered a breach is in. Based on their interpretation, they would expect us to deconstruct, in essence, these very complicated SEMS units and have an expert to say, well, Part A is not defective and it has this value. Part B is defective, so it's worthless. Part C is not defective, so it has this value. For three years, and this is outlined in the district court's opinion, for three years, the manufacturer, ALTEC, couldn't distinguish between which parts were working and which parts were not working. If they had been able to do that, if they had been able to identify the defective part, then we would have gotten it replaced and have never been here. So we think that the requirement to deconstruct the machine and somehow on us to place value on each of these parts and explain how they could be used in the future is not where the burden should lie. Where the burden should lie should be with, to the extent ALTEC viewed some of these parts as reusable, as having utility in the future, they should have met the burden of proof on mitigation of damages and stated the value and stated why it could have been used in the future. Now, they did assert mitigation of damages as an affirmative defense in their answer. The record reflects they did not pursue it at trial, and the best indication of that was the findings of fact and conclusions of law that they submitted to the district court doesn't even contain the word mitigate, okay? And I believe, Your Honor, the only other thing I want to say in closing is that we did find authorities interpreting fetters the way that is not in the disjunctive. If it cannot be repaired, it is then worthless. The Bishop case out of Connecticut, we found the UCC interpretation and the Encyclopedia Mississippi Law, I know that's just persuasive value. Anderson, which is the Anderson on the UCC, which is a treatise that fetters cited, not on this particular point, admittedly, but it was a treatise that fetters relied on, what they state is for the value analysis with respect for accepted goods in which the breach of warranty occurs, that the value should look at, value analysis should be viewed from the perspective of whether the goods were defective, quote, for the purpose for which they were impliedly warranted as being fit. If there are no other questions, Your Honor, I'll yield the rest of my time. Thank you. Thank you, Counsel. Counsel, was this issue of who had the burden of proving the value litigated in the trial court? The issue of whether this was mitigation was never raised until today. It's not in the briefs. The idea that the burden was on us to prove the value was never raised before. And good morning, Your Honors. I'm Mike Myers. No, Your Honor, that was not an issue. It was never questioned that the plaintiff had the burden of proof in the case. The issue that the plaintiff has raised is, well, I know the statute says I've got the burden of proof, and I know the statute says ordinarily the way you prove damages in a case like this is to prove the difference between the goods as delivered and the goods as contracted. But we don't have to prove that. Keep in mind that the court's determination that the plaintiff failed to meet its burden of proof under the standards set forth in 2314, that issue is not before the court. They haven't appealed that. They haven't contested that the court's factual determination that they failed to meet the burden under the statute. That's not an issue. They just say we don't have to do it. And I think it's interesting that they argue this would have been too much trouble. In their briefs, they say it would be overly burdensome for us to have to prove this. They had an expert sitting in the courtroom. They had designated the representative from Amt Cherokee who sold them the system they put in later. He was the one who gave them an estimate, and there was testimony about how much of the system he was willing to use with his own system. Mr. Myers? Yes, Your Honor. Judge Jones, I have a question about that, though. Suppose instead of being a sophisticated industrial unit, the plaintiff here was a consumer who had purchased a secondhand auto, and the secondhand auto proved to be a bunch of junk, and it had this repair-replace warranty, and they sued under 2714 and had to go to trial, God forbid, and the seller said, Ha ha, you have to prove the entire remaining value of this car, because, of course, we can strip the tires. We can strip whatever the radio is nowadays. We can strip the upholstery. We can strip it, you know, the bumpers, if they're in good shape, and so on and so forth, and you have to prove all that in order to prove your damage, the value of the car I purchased, and the value that it had. Now, does that make any sense to you? Well, Your Honor, that is sort of what the plaintiffs are arguing, that we're arguing that the scrap value of these components had to be proven, and that's not what we're arguing, and that's not what you would have to prove in a case of a lemon automobile. But they added, if you said they had an expert in the courtroom, what was the expert going to testify to? Well, some of the same things that he put in his report, that there's equipment that is serviceable, that we can use, so you don't have to buy new equipment. They saved $23,000 off the purchase price. The testimony was they could have saved up to $90,000 if they had used more, and that's just the equipment that Amt Cherokee was willing to use with its equipment. These people deal in equipment. They know what this stuff is worth, and a plaintiff who has a lemon automobile has the same burden under the UCC that it has under the common law. Prove the difference between what you bargained for and what you got. And what we're asking the plaintiff to be held to is what the statute requires. The statute says this is the way you prove damages. And for them to argue that it's too burdensome for them to comply with the statute would suggest that in any case. Not being the case, Mr. Myers, how is it that nobody cited another case in which the plaintiffs have been denied any damages under the same rationale that the district court used here? That's what troubles me. Well, Your Honor, we're not talking really here about there's two issues. There's the question of what is the standard, and then the question is did you meet the standard. And the problem the plaintiff has is that they didn't meet the standard that the statute sets forth. They took the position that we don't have to prove what the value of the goods were as delivered. That's contrary to the statute. The judge said this is the statute that applies. The reason we are here is because they didn't put on any proof, not because of an improper legal rule. They chose to interpret fetters in a way that, frankly, it just doesn't say. And as Judge Reveley pointed out, it doesn't say that something that can't be repaired is automatically worthless. If that were the case, then these repair and replacement warranties wouldn't mean anything. So I don't understand how the plaintiff can say that under fetters we don't have the burden to prove anything. And that's not what fetters says. These cases that they cited in their reply brief, we never had an opportunity to respond to them, but there were six cases that they cited with regard to issues where people were entitled to recover the full purchase price. But in each one of those cases, it was a question of fact. It was a question of fact for the fact finder, either the jury or the judge, as to whether the property had any residual value. And in some of those cases, they found that it did. I think the Winnebago case, they found that it was worth 25% of what it had been sold for. So it was not saying that as a matter of law, because these things were unrepairable, they're automatically worthless. There were factual determinations that they were worthless. Well, there's a factual determination in this case that is uncontested, that components of this system were not worthless. And the plaintiff is asking the court to say that the law presumes something that's not true. He's asking this court to say as a matter of law that this entire system of components was worthless, when as a matter of fact, undisputed fact, it wasn't. And the law doesn't recognize absurdities. I would also point out that with regard to Fetters, Fetters was not really a case about the UCC. It was a case about enforcing a settlement agreement. And much of this discussion in Fetters really was dicta. It was kind of leading up to what the real dispute was in the case. So I think it's asking too much to say that Fetters says what they claim it says. I really think that's all that needs to be said on that issue. Steele has not raised its question about attorney's fees. That was the other issue that it appealed on. I would like to touch on that just briefly.  The question of the $130,000 penalty that Steele paid to the Mississippi Department of Environmental Quality, they claim they were entitled to the whole thing, even though 11 of the 13 things that they were cited for in the agreed order weren't caused by us. That's undisputed. But they took the position they were entitled to get the entire $130,000 back. They are not disputing the court's decision now that they can't. And, in fact, in their brief, they concede that their proof on trying to recover the MDEQ penalty was insufficient. They now concede that. But keep in mind that when they were claiming the $130,000 at trial, they were claiming that in conjunction with the $172,000 in attorney's fees and saying these $172,000 in attorney's fees were incurred in fighting this $130,000 penalty. Well, now that the penalty's been thrown out because they didn't prove how much of it was attributable to us, they're still saying that the $172,000 in attorney's fees is just for stuff related to the Sims. And they did. One of the attorneys from their firm testified that anything in the statements unrelated to the Sims has been deducted. The problem is that's just not true. Now, you say, quote, not true. How did you demonstrate that at trial? They demonstrated it in the documents that they submitted in evidence to the court to set forth what their attorney's fee claims were. And there are detailed billing records. They are in our record excerpts at tab 8. All right. So you're saying that the district court rendered a disputed finding of fact that their attorneys were not testifying accurately when they said, we've deducted, I think it was $40,000, and all the rest of the attorney's fees had to do with explaining the Sims failure to the MDEQ. That was the testimony from one witness. There was testimony from another witness that they had deducted anything that wasn't related to the notice of violation. And keep in mind the notice of violation was broader. Well, fine. You can clarify that. But I'm saying, you're saying, because I didn't read it that way, that the district court made a disputed finding of fact that their attorneys were not testifying accurately about their billing records. No, Your Honor. I'm not saying that. And if I implied that, I apologize. The district court did not get into that in much detail. The district court basically said, you lose on the penalty, and therefore you lose on the attorney's fees that are tied to the penalty, because you didn't prove how these fees or how the penalty is allocated, and therefore you haven't proven how the fees are allocated. The standard before the court is, was her determination supported by substantial evidence? And it is. The attorney's fee bills that— No, it was their fee way. I'm sorry, Your Honor. Well, I mean, I know you implied findings in favor of that, but I'm just rather troubled by the idea. I realize, you know, normally you put on attorney's fees, you put on the billing records, you put on the attorneys, and normally speaking, the court accepts what the attorneys are saying unless it seems to be, you know, patently at odds with the records. And all you've done is show occasional little tidbits from the billing. Well, that doesn't say that. That doesn't say that. And, you know, that seems like a pretty quibble compared with the under oath testimony of attorneys. Well, Your Honor, I would take issue with the court's idea that these are quibbles. These are substantial portions of the bills, and I would ask the court to look back at what it was that was being responded to, because if you look at the response letter that Steel Dynamics back then called Severstall submitted in August of 2013, where they self-reported 11 additional violations, they tried to characterize those as minor reporting violations. But, in fact, one of them they said that they submitted incomplete, as they called it, semiannual certifications of compliance reports. Well, those incomplete reports actually said we have functioning SIMs and there's no deviations with them, two times. In number 10 of their self-reported violation, they say, well, we failed to conduct the annual stack test for a couple of the lines for the calendar year 2012. Well, that's true. They did fail to conduct the stack test. They also submitted reports to the DEQ saying that they did. They submitted a false report saying that they had conducted the stack test. There was some serious stuff going on here, and their attorneys, to their credit, were doing their best to try to mitigate the damage from what their client had done. But is it fair for you to support the district court finding on sort of a, you know, an ipsy-dixy, well, they're responding to all these NDEQ things, therefore they are overcharging vis-à-vis the SINs unit. Well, Your Honor, keep in mind that what she said was they haven't proven what part was related to ALTC's conduct and what part wasn't. And I don't think it's nitpicking to say the record before the court, before the trial court, and the documents that the plaintiff submitted into evidence don't support that they did that. And it's not just a few entries, and it's not just a little bit of time. You can look and see where they were talking about dealing with other potential violations. They spent like 20 hours working on the response. The initial violation was you don't have functioning SINs. But the time that they were spending and all these discussions they were having was all the other things that they had turned up that they were having to self-report. And you can look through here. There's multiple entries. We cite some of them in our brief. There's others that we haven't cited. But we're talking, you know, substantial amounts of money. And it's not the district court's job to go through and figure out, based on these confusing billing records. No, but, again, you have the attorney's testimony. Well, in your honor, the district court. Cross-examined them. We cross-examined them about the penalty, and they admitted that the penalty, that they couldn't break it out. And the fees went along with the penalty. That was the position they were taking throughout the trial, that these are fees that we incurred in fighting this penalty. And now they've admitted that they didn't prove the penalty, but they're still trying to collect the fees. And, your honor, I don't understand how the district court can be an error for saying that they didn't prove what was related and what wasn't when the evidence, the documents are just as much evidence as the testimony. And the documents do not support what the plaintiffs are claiming. It simply does not. I've got just a few minutes left, and if I could move on quickly. And I just want to be clear, because the documents, what I understand you to be saying is that the documents reflect that they didn't call out from all of the billing those fees which were incurred as a result of Altec's breach. You're not quarreling with their entitlement to fees resulting from Altec's breach. But your contention is that they include among those fees that resulted from their own breach. For example, their own failure to report that the SIMS wasn't working. So they had some fees related to responding to those violations and those kinds of things that didn't result from Altec's breach but resulted from their own violations. And you're saying they didn't call out that from among what they submitted in support of the attorney's fees request. Yes, sir. There's two issues. One is the proof, and the proof has shown that they didn't submit fees, fee expenses that were only related to the SIMS issue. But there's a legal issue, and that brings up our cross-appeal that I wanted to talk about briefly. And that is the provision that was negotiated in the contract to limit consequential damages or exclude consequential damages, which would include the attorney's fees. Paragraph 27 of the agreement between the parties specifically excluded any consequential damages. And keep in mind these were large commercial parties. They were both represented by counsel in the contract negotiations. We've got, I think, on tab 6 or 7 of the record excerpts, the email chain and the documents going back and forth between the attorneys where they're negotiating the terms. And Steele's in-house attorney sent an email and said, We accept paragraph 27. That was added. It's actually the last thing in there, and if you look in the record online, it's red. We accept paragraph 27 that excludes any consequential damages. So we've got a freely negotiated contract between large commercial parties, and unless they can come up with some legal reason why the contract shouldn't be enforced under the terms of the contract, we don't know any consequential damages, including these attorney's fees. Their argument is that under Mississippi law, if a warranty fails its essential purpose, then you also cancel out any consequential damages exclusions. In other words, if the warrant does not fulfill the warranty, then you cancel that exclusion out. That's what they seem to be arguing. Well, isn't that what Madison Ferguson says? Actually, if you look at it closely, Your Honor, I don't think it does. I would ask the Court to back up just briefly, because what we're talking about here is 752719, and there's two provisions. Subsection 2 says, Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this code. Then there's a second section, number 3. Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. And then there's some other provisions that don't apply. There's never been any suggestion that the limitation or exclusion was unconscionable in this case. What the plaintiffs seem to be arguing is that if 2 kicks in, then it nullifies 3. And there's no case that says that. Madison Ferguson doesn't say that. The section about consequential damages being limited or excluded is not discussed in Madison Ferguson. And keep in mind that in Madison Ferguson, it not only had an exclusion for consequential damages, but it had an exclusive warranty provision. And if you look at the warranty that was attached to the opinion, it says the company will repair or replace at its option, and then it says the remedies of the owner set forth therein are exclusive. And then it's got a consequential damages exclusion in addition to that. But if you look at the language of the case, it says the appellant strongly argued that Madison Ferguson's damages was limited by the written warranty to either repair or replacement of any defects. That's the repair or replace warranty. Such limitation of damages as allowed under 2719 presupposes that the warrantor has fulfilled his warranty. In this case, Madison Ferguson failed to either repair or replace the defective equipment and therefore breached its warranty. Under these circumstances, the buyer's remedies are governed by 2714. It doesn't say and never discusses, and there's not a Mississippi case that discusses what happens to 752719-3 if a warranty fails its essential purpose under 752719-2. There's not a Mississippi case that discusses that that we're aware of. And the Riley case from Alabama from 1971, it doesn't discuss it. We don't think Riley has any application here anyway. We cited a couple of district court opinions where this precise issue was discussed. And one of them, interestingly, was the Eastman Chemical v. Nero case. It was addressing Tennessee law. And Tennessee had the same situation Mississippi does. There was never a case in Tennessee where the court had had to address what happens to subsection 3 if a warranty fails its essential purpose under subsection 2. And the district court, making neary guesses, this court basically is going to be doing, said these provisions stand alone and we find that 2 doesn't cancel out 3. And if you look at the statute, there's nothing in the statute that says if the warranty fails its essential purpose under subsection 2, then you can't exclude consequential damages under subsection 3. Counsel, your time has expired. Thank you. Thank you. Rebuttal. Thank you, Your Honor. I just want to briefly address a couple of things the counsel office had stated a moment ago, that we did not, that still did not try to meet their burden, their initial damage calculation burden. We put on proof what we paid, and under our interpretation, once we put on proof that these items could not be repaired, we proved that they were worth zero. Now, I'm going to give a quick, absurd example to prove that the way, to try to demonstrate the way ALTEC wants fetters to work just can't work. Under ALTEC's theory, they could have backed the dump truck up to Steel Dynamics and just dumped hunks of junk there to fulfill their SEMS order. And we would have had the obligation of rolling up our sleeves and digging through it and finding out what had value and what did not. It's Steel's position, Your Honor, that it's just an unreasonable burden to put on the buyer. In terms of the attorney fee, the attorney's fees that the court did not allow us to recover, it is true, and we'll stipulate that the penalty, the $135,000 penalty, which related both to SEMS violations and other violations, did not parse out the amount between the different violations. And so we'll absolutely stipulate that it was very reasonable for the court to say, I don't know what was related to the SEMS, so I can't award you anything. But on the attorney's fees, we put on attorneys and the client under oath that stated, hey, look, we went through every single line of this, and if a line I don't mention, the work was both for SEMS and for another violation, we pulled it out. If only ones we left in were the ones that said solely that they related to SEMS work. Now, counsel is identifying entry after entry after entry and is now saying, well, what about this, what about this, and what about this? That was what they could have done at trial so that the attorney who was under oath could have said, yeah, you know, you're right about that, or no. I can tell from that entry, I know what it's about. That's 100 percent SEMS related. There was no cross-examination. There was no documentation that was contrary to the testimony that was submitted. Well, you know, I mean, SEMS related is too broad, isn't it? I mean, one of the violations was the failure to report that the SEMS wasn't working. That was SEMS related. Correct. And, Your Honor, the attorney— You claim you were entitled to attorney's fees for that? We were just entitled to those attorney's fees that were directly related to— Related to all text briefs. Right, to all text briefs. And, Your Honor, I think what you're stating right there, if there were particular entries that put forth things like that, they could have questioned the attorneys at trial and said, well, is this really just for the SEMS unit or is this for something else? But that wasn't done. And in terms of—and I think it's important in terms of what the district court looked at to make this determination that there was no way to parse the attorney's fees between SEMS related activity and non-SEMS related issues. If she states, and this is—and I quote, she states, unable to attribute the MDEQ fine to all text briefs still is likewise unable to attribute its attorney's fees in dealing with the MDEQ and its damage claim for such amount must also fail. I mean, that—all the testimony that we put on about our attorney's fees stated exactly the opposite of that. We can't parse the MDEQ penalty, but we can parse our fees. At least we can parse them to a reasonable degree. One last thing on the consequential damages issue, Your Honor. I agree with you that you read Massey carefully enough. Massey seems to be very clear that there were limitations in place in that case, consequential damage limitations, and that the repair and replace warranty failed its essential purpose. And the court then, on the heels of it failing its essential purpose, stated that the purchaser was entitled to any remedy available under the UCC. So I disagree with counsel's reading of Massey. I think it stands for that clear proposition. The cases that they cited that were to the contrary were from Texas, New York, and Tennessee. Those states clearly state that failure of the repair and replace warranty doesn't necessarily make the other limitations moot. But we're deciding this under Mississippi law, and on Mississippi law, that point is clear. Unless there are other questions, Your Honor, I have no other comments. Thank you, counsel. Thank you, Your Honor. The next case is Shelby Trahan v. Wayne Mellencamp.